UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

EDWARD BANYAI and JUDITH A. ZINN, on          :
behalf of themselves and a class of similarly        :
situated individuals,                                          :
                             Plaintiffs,                :          00 Civ. 9806 (SHS)
                                            :
        -against -                                      :
                                            :          <u>OPINION</u>
JAY MAZUR, RONALD ALMAN,                            :
EDGAR ROMNEY, the INTERNATIONAL             :
LADIES' GARMENT WORKERS' UNION, the        :
ILGWU DEATH BENEFIT FUND, and the 21st       :
CENTURY ILGWU HERITAGE FUND                    :
                                            :
                         Defendants.                :
------------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

       This class action litigation arises from the allegedly improper dissolution of the

ILGWU Death Benefit Fund – a benefit fund of the International Ladies' Garment

Workers' Union ("ILGWU" or "the Union") – the simultaneous transfer of $77.5 million

in actuarial surplus from the Death Benefit Fund to an ILGWU escrow account, and,

approximately one year later, the transfer of $12.5 million from that escrow account to a

newly formed not-for-profit corporation, the 21st Century ILGWU Heritage Fund

("Heritage Fund").  Class Counsel, on behalf of the plaintiff Class, and defendants Jay

Mazur, Ronald Alman, Edgar Romney, the Union,[1] and the ILGWU Death Benefit Fund

(together, the "Settling Defendants") have moved jointly pursuant to Fed. R. Civ. P. 23(e)

for final approval of the partial settlement of this class action on the terms set forth in the

---

[1] In 1995, the ILGWU was consolidated with the Amalgamated Clothing and Textile Workers Union to form the Union of Needletrades Industrial and Textile Employees, which the Union styles as "UNITE!". Since that merger, UNITE! has in turn merged with the Hotel Employees and Restaurant Employees International Union, forming UNITE HERE.  For purposes of this Opinion, the Court refers to the "Union" when referring to the ILGWU, UNITE!, or UNITE HERE, as the case may be.

Settlement Agreement executed by the parties on September 26, 2003, as amended on January 12, 2004 (the "Settlement Agreement").

By Orders dated September 7, 2004 and September 12, 2005, this Court granted its preliminary approval of the Settlement Agreement and scheduled a hearing for December 14, 2005 on whether the terms of the Settlement Agreement were fair, reasonable, and adequate and directed Class Counsel to provide notice to the Class.  In October 2005, 97,443 members of the Class – including 26,950 then current active participants – were sent notice by first-class mail (or by notice provided to their employer) of the terms of the proposed Settlement Agreement and the date and purpose of the fairness hearing.  (Affidavit of Michael Hirsch dated Dec. 7, 2005, at ¶¶ 3,8 attached to Class Counsel's and Settling Defendants' Joint Memorandum of Law In Support of Motion For Final Approval of Partial Settlement ("Joint Mem.").)[2]  Notice was also provided by newspaper publication.  As of November 25, 2005, ten objections were filed by members of the Class.  At the fairness hearing on December 14, 2005, testimony was taken and the Court heard legal argument.  The Court also received several additional written objections from members of the Class after the fairness hearing was concluded.

As explained below, the Court has examined the substantive fairness of the proposed settlement and the procedural integrity of its negotiation.  Based on, among other factors, the substantial risks faced by plaintiffs to prevailing in this litigation and the potential for additional expense and delay, the Court concludes that the compromise

---

[2] Out of the 26,950 then active participants, 637 were inadvertently not mailed the notice in October 2005. The Court directed that those 637 participants be sent notice by overnight mail by Order dated November 2, 2005.  (Id. ¶5.)

embodied by the proposed settlement is fair, reasonable, and adequate.  Accordingly the

partial settlement of this action is approved pursuant to Fed. R. Civ. P. 23(e).

I.      FACTS

The following facts, which were also set forth in this Court's August 30, 2005

decision granting in part and denying in part plaintiffs' motion for summary judgment

against the Heritage Fund, are taken from the parties' agreed upon Joint Statement of

Undisputed Facts ("J. Stat.").

A.      The Parties

Plaintiff Edward Banyai is a retired employee of defendant Union and a

participant in the Death Benefit Fund.  (J. Stat. ¶¶ 6-8.)  Plaintiff Judith Zinn is the wife

of Harris Zinn, who is also a retired employee of the Union.  (Id. ¶¶ 9-10.)  Harris Zinn

designated Judith Zinn as his beneficiary and as such she is entitled to receive any monies

paid out of the Death Benefit Fund upon Harris Zinn's death.  (Id. ¶ 9.)  Banyai and

Judith Zinn are the named representatives of the plaintiff Class who commenced this

litigation, although they oppose approval of the settlement, as described below.

Defendants Ronald Alman, Jay Mazur, and Edgar Romney are trustees of the

Death Benefit Fund, members of the Union's Death Benefit Committee, members of the

Union's General Executive Board, and "fiduciaries" with respect to the Death Benefit

Fund within the meaning of ERISA.  (Id. ¶¶ 11-13.)  Together, these defendants had

"authority and control over the investment and disbursement" of the Death Benefit Fund.

(Id.)  In addition, these defendants all were members of the Heritage Fund's board of

directors.  (Id.)  Mazur also was President of both the Union and the Heritage Fund, as

well as the chairman of the Heritage Fund's board of directors; Romney also was Vice

President of the Heritage Fund.  (<u>Id.</u> ¶ 11, 13.)

ILGWU was a collective bargaining organization representing garment workers,

and was governed by its General Executive Board.  (<u>Id.</u> ¶ 2.)  The Heritage Fund is a not-

for-profit corporation organized in December of 1997 pursuant to the laws of Delaware.

(<u>Id.</u> ¶ 17.)  Finally, the Death Benefit Fund is a fund that provides death benefits to

members and retired members of ILGWU, and is a "welfare plan" within the meaning of

ERISA.  (<u>Id.</u> ¶ 1.)

       B.     <u>The Documents that Governed the Death Benefit Fund</u>

In 1953, the Union merged two pre-existing funds to form the Death Benefit Fund

that is the subject of this litigation.  (<u>Id.</u> ¶ 29.)  Article 13 of the Union's constitution

governed the Death Benefit Fund and set forth several noteworthy provisions.  (<u>Id.</u>)  First,

that the Death Benefit Fund was funded through a combination of contributions from the

union members personally, assessments imposed upon the member by his local union, the

local union itself, or other benefit funds established by the union members' employers.

(<u>Id.</u>)  Second, that no "funds or property of the [Union] shall be liable" for the payment of

benefits.  (<u>Id.</u>)  Third, that "[n]o withdrawals shall be made from [the Death Benefit]

Fund except for the payment of death benefits and the cost of administering the same."

(<u>Id.</u>)  Last, that the Union's General Executive Board had the power to "adopt and amend

from time to time rules and regulations for the administration of the [Death Benefit]

Fund, not inconsistent with the provisions" set forth above, and that any amendments

thus made would be "incorporated in and a part of" the Union constitution.  (<u>Id.</u>)

In 1965 the Union constitution underwent significant amendment.  Article 13's provisions governing the Death Benefit Fund were removed and amended, and became the initial Rules and Regulations of the Death Benefit Fund (the "Rules").  (<u>Id.</u> ¶¶ 33, 38).  In addition, two important provisions were added to Article 29 of the Union constitution.  First, section two of Article 29 provided that, "All moneys received by the [Union] . . . as contributions to a fund for the benefit of workers … shall be kept in a bank account separately maintained under the name of such fund.  The monies in such account shall be used only for the specific purposes of such fund . . . and shall not be used for any other purpose."  (<u>Id.</u> ¶ 38.)  Second, section five set forth that, "The death benefit fund, as heretofore established and supplemented and as consolidated in 1953, is continued as a single and irrevocable trust fund to be administered by the [General Executive Board] and its designees in accordance with the fund's rules and regulations."  (<u>Id.</u>)  The Rules of the Death Benefit Fund contained a provision substantially similar to section five of Article 29 that referred to the Death Benefit Fund as an "irrevocable trust."  (<u>Id.</u> ¶ 46.)

The Rules also set forth, as had former Article 13 of the Union constitution, that no "funds or property of the [Union] shall be liable" for the payment of benefits and "[n]o withdrawals shall be made from [the Death Benefit] Fund except for the payment of death benefits and the cost of administering the same."  (<u>Id.</u>)  The Rules further set forth that the Death Benefit Fund would be funded through contributions from other benefit funds established by union members' employers, the general revenues of local unions, or assessments levied by local unions upon their members.  (<u>Id.</u> ¶¶ 46, 51.)  Last, the Rules provided that the General Executive Board was "authorized and empowered to adopt and amend from time to time rules and regulations for the administration of the Fund."  (<u>Id.</u> ¶

46.)  However, in order to amend the Union constitution, "a majority vote of the delegates . . . at any triennial convention" of the Union was required.  (Id. ¶ 45.)

In 1976, the Union's General Executive Board amended the Rules to add provisions concerning the termination of the Death Benefit Fund.  (Id. ¶ 52.) Specifically, the amendments provided that, "This Plan shall cease and terminate . . . in the event of termination by action of the General Executive Board."  (Id.)  Moreover, the amended Rules set forth that in the event of termination, the committee administering the Death Benefit Fund shall "apply the Plan's assets to pay any and all obligations of the Plan and distribute and apply any remaining surplus as will, in [its] opinion, best effectuate the purposes of the Plan and the requirements of law."  (Id.)  The amended Rules also provided that,

> No part of the principal or income [of the Plan] shall be used for, or diverted to, purposes other than the exclusive benefit of active and retired participants under the Plan . . . before the satisfaction of all liabilities for benefits under the Plan.  No . . . participant . . . shall have any interest in or right to any part of the earnings of the Trust . . . or any part of the assets thereof, except to the extent expressly provided in this Plan.  (Id. ¶ 53.)

Last, the amended Rules set forth that upon approval of the General Executive Board, the Death Benefit Committee could amend the Rules.  (Id. ¶ 60.)

Notwithstanding the addition of the termination provision, the 1976 amendments left intact the provision of the Rules describing the Death Benefit Fund as an "irrevocable trust."  (Id. ¶ 48.)  Similarly, the Summary Annual Reports of the Death Benefit Fund published in February and November of 1977 and December of the following year provided that the Death Benefit Fund was "a single and irrevocable trust established under" Article 29 of the Union constitution.  (Id. ¶ 50.)  In all material aspects, the Union

constitution and the Rules remained as set forth above for twenty one years – until 1997,

when the Rules were again amended in advance of the transaction that gave rise to this

litigation.

      C.      <u>The 1997 Amendments, the Dissolution of the Death Benefit Fund, and</u>
                <u>the Transfer of Money to the Heritage Fund</u>

In February of 1997, the Rules were amended to eliminate any reference to the

Death Benefit Fund as an "irrevocable trust."  (<u>Id.</u> ¶ 59.)  In June the Death Benefit

Committee passed a resolution setting forth that it had determined that a benefit increase

would be in the best interests of the Death Benefit Fund's participants but that the

General Executive Board had "indicated that it would approve a benefit increase only if

the Fund is terminated and its remaining surplus is used . . . . to further other interests of

the participants and beneficiaries of the Plan."  (<u>Id.</u> ¶ 61.)

Accordingly, the Death Benefit Committee proposed an amendment that provided

that in the event of termination, the Death Benefit Committee shall "apply any remaining

surplus . . . to promote the charitable interests and other labor related endeavors of the

[Union] . . . [and] for any other purpose deemed appropriate or desirable by the [General

Executive Board] in its sole and absolute discretion."  (<u>Id.</u>)  Six days later the General

Executive Board adopted that amendment.  At this time, the Death Benefit Fund had an

actuarial surplus of approximately $77.5 million.[3]  (<u>Id.</u> ¶ 66.)

In December 1997 the Heritage Fund was formed as a not-for-profit corporation.

That same month the General Executive Board passed a resolution providing for both the

termination of the Death Benefit Fund at the end of December and the near-simultaneous

---

[3] An "actuarial surplus" is that sum by which the Fund exceeds the amount needed to continue paying indefinitely the level of benefits then in effect, based on the interest rate assumptions of the actuary.  (<u>Id.</u> ¶66.)

creation of a new Death Benefit Fund on January 1, 1998 to absorb all of the terminated

fund's liabilities.  (Id. ¶ 63.)  The resolution also provided for an increase in benefits to

participants.  (Id.)

Pursuant to this resolution, $77.5 million was transferred from the Death Benefit

Fund to a Union escrow account.  (Id. ¶¶ 63, 66.)  Roughly one year later, $12.5 million

from that escrow account was transferred to the Heritage Fund.  (Id. ¶ 71.)  In his

deposition, Mazur was asked whether "the governing board of the Heritage Fund [was]

aware" that the "source" of the $12.5 million was the Death Benefit Fund, and he replied,

"Yes."  (Id. ¶ 72.)  In Alman's deposition, he stated that the reason for terminating the

Death Benefit Fund was to provide money to be transferred "[t]o a Heritage Fund, that

was being set up."  (Id. ¶ 74.)  Mazur testified that such a transfer was his idea (id. ¶ 73),

which he set forth at a meeting of the General Executive Board in December of 1997.

(Minutes of ILGWU General Executive Board Meeting dated Dec. 11, 1997 at 1, Ex. 52

to Joint Statement of Undisputed Facts.)

In 1998, retired participants of the terminated Death Benefit Fund were sent a

"Summary of Material Modification" which advised them that "the Death Benefit Fund

was terminated on December 31, 1997" and that a "new Death Benefit Fund has been

established . . . ."  (J. Stat. ¶ 77.)  This document also was published in UNITE!

Magazine in July of 1998, received by Banyai and Judith Zinn, but did not set forth that

any of the terminated Death Benefit Fund's assets had been transferred.  (Id.)  However,

in November of 1998, a Summary Annual Report was published in UNITE! Magazine,

which Banyai and Judith Zinn received; that report described the transfer of assets from

the terminated Death Benefit Fund to the Union.  (Id. ¶ 78.)  Banyai and Judith Zinn

maintain that they did not "see" this document and that "they first heard of the transfer of assets" in the spring of 1999.  (Id.)

     D.    <u>Procedural History</u>

On December 27, 2000, plaintiffs filed this action and alleged violations of ERISA sections 403, 404, and 406, contending that the termination of the Death Benefit Fund and the transfer of the $77.5 million to the Union was a sham, ineffective, and inconsistent with the Death Benefit Fund's governing documents.  Plaintiffs also contend that the Heritage Fund knowingly participated in the alleged ERISA violations by accepting the $12.5 million that had been transferred out of the Death Benefit Fund. Plaintiffs have subsequently filed a First and Second Amended Complaint.  In response to plaintiffs' allegations, defendants contend that the termination of the Death Benefit Fund was lawful and beneficial to ILGWU members because the $77.5 million that was transferred to the Union constituted surplus funds that were going to be used by the Union to strengthen organization and strike funds, to promote charitable interests, and to combat discrimination, among other goals.  Defendants further contend that even after the transfer of the $77.5 million, the newly established Death Benefit Fund remained overfunded by between $70 and $80 million.

On January 8, 2002, the Court certified a plaintiff class pursuant to Fed. R. Civ. P. 23 consisting of "[a]ll persons who were participants or beneficiaries of the [Death Benefit] Fund on the date this action was commenced, or who became participants or beneficiaries of the [Death Benefit] Fund prior to the final termination of this action . . . ."  <u>Banyai v. Mazur</u>, 205 F.R.D. 160, 162 (S.D.N.Y. 2002).  In that Order, the Court appointed Banyai and Zinn as Class Representatives and appointed Marc I. Machiz of

Cohen, Milstein, Hausfield & Toll, P.L.L.C. and David S. Preminger of Rosen, Preminger & Bloom as Class Counsel.  Id. at 165.

The parties then engaged in discovery, motion practice, and extensive, lengthy, and difficult settlement negotiations under the supervision of Magistrate Judge Frank Maas.  That process ultimately yielded the proposed partial settlement now before the Court, which the Heritage Fund has not joined.  As noted above, the Court preliminarily approved the proposed settlement on September 7, 2004, and a fairness hearing was held – after due notice to the Class – on December 14, 2005.  The Settlement Agreement resolves this action as against all defendants, with the exception of plaintiffs' claim for equitable relief as against the Heritage Fund.

> E.    The Terms of the Proposed Settlement

As described above, this litigation arises from the termination of the original Death Benefit Fund and the transfer of approximately $77.5 million of the Fund's actuarial surplus to the Union, $12.5 million of which was subsequently in turn transferred to the Heritage Fund.  In brief, the Settlement Agreement provides that $59.5 million of the $77.5 million that was transferred out of the original Death Benefit Fund will remain the Union's money – and will not be returned to the Death Benefit Fund. (See Settlement Agreement ¶3(a).)  In exchange for plaintiffs giving up their right to seek a recovery from the Settling Defendants on behalf of the Fund of all or any part of the $77.5 million that was from transferred from the Death Benefit Fund, beneficiaries of Death Benefit Fund participants who died or die after December 1, 2002 will receive an initial benefit increase expected to be approximately $825.00, a 33% increase over the current death benefit.  (Id. ¶4(a).)  That initial benefit increase – which is expected to cost

approximately $40 million – will be paid for out of the approximately $57 million actuarial surplus that remains in the new Death Benefit Fund.[4]  (Id.)  The Settlement Agreement further provides, importantly, that the majority of any newly developed surplus over the next seven years will be used to provide future benefit increases.  (Id. ¶4(c).)  As set forth in greater detail in the Settlement Agreement, the Death Benefit Fund's actuary will determine upon each of the first seven anniversaries of the settlement's "effective date"[5] whether the Death Benefit Fund's assets exceed 120% of the then actuarial present value of benefits; if so, 60% of those assets that are in excess of 110% of the then actuarial present value of benefits will be used to fund increased benefits for Death Benefit Fund participants who die on or after the relevant anniversary date.  Id.  Furthermore, the participant population of the Death Benefit Fund will be "frozen" to assure that benefits are not diluted by the inclusion of new participants.  (Id. ¶4(f).)  The remaining 40% of "excess assets" will revert to the Union at such time or times as the Union shall determine.[6]  (Id. ¶4(c).)  If the Death Benefit Fund has assets in excess of 110% of the actuarial present value of benefits after the seventh anniversary of the Settlement Agreement's effective date, those excess funds will then revert to the Union.  (Id. ¶4(h).)

The Settlement Agreement also requires Federal Insurance Company – the fiduciary liability insurance carrier for defendants Mazur, Alman, and Romney – to make

---

[4] The actuarial cost of the initial benefit increase includes a "cushion" such that the Death Benefit Fund remains funded at 110% of the actuarial present value, taking into account the increased benefits.  (Id.)

[5] The settlement's "effective date" will be the later of the date by which this Court issues an order of final approval of the Settlement Agreement and either (i) the time to appeal or otherwise seek review of that decision expires or (ii) in the event that appeal or review is sought, this Court's judgment is affirmed and not subject to further judicial review.  (Id. ¶2.)

[6] Assets in the Death Benefit Fund to which the Union is entitled pursuant to the Settlement Agreement, but which remain unredeemed, will not be taken into account by the actuary when determining the level of any actuarial surplus.  (Id. ¶4(c).)

a $2 million payment, of which at least $1 million will be transferred to the Death Benefit Fund.  (Id. ¶3(b).)  The remaining portion of the payment will be allocated to cover unpaid fees, expenses, and costs related to the action.  (Id.)

In addition, the Class preserves its right to proceed against the Heritage Fund for restitution of the $12.5 million transferred to it, with the assurance that any funds recovered for the Death Benefit Fund will be dedicated to future benefit increases for the Class and will neither be taken into account when determining actuarial surplus nor revert to the Union.  (Id. ¶14(a).)  However, any judgment against the Heritage Fund in this action, or any settlement amount paid by the Heritage Fund to settle plaintiffs' claims in this action, will be reduced by the amount of the liability of any of the Settling Defendants to the Heritage Fund.  (Id.)

Finally, the Settlement Agreement provides safeguards to assure that Death Benefit Fund assets cannot in the future be used in any way that would threaten existing benefits, the initial benefit increase, or the subsequent increases provided for in the Settlement Agreement.  The Settlement Agreement also attempts to assure the prudent management of the Death Benefit Fund's assets in the future by replacing the current members of the Death Benefit Committee by three trustees, two of whom will be appointed by the President of the Union and a third – the Class Trustee – who will be appointed by Class Counsel.  (Id. ¶6(a).)  The Settlement Agreement sets forth specific rules regarding meetings of the trustees, voting structure, and their compensation and termination.  (Id. ¶6.)  The Class Trustee holds veto power, but the other trustees may seek arbitration where a veto has been exercised.  (Id. ¶6(g).)  Any changes to the actuarial assumptions – including those assumptions that underlie the determination of

actuarial surplus at the effective date and during the following seven-year period – must

be approved by the Class Trustee, and notice of any change must be published in the

UNITE! newsletter and brought to the attention of Class Counsel.  (Id. ¶4(b).)

II.     DISCUSSION

      A.     The Standard for Approving a Proposed Class Action Settlement

      Fed. R. Civ. P. 23(e) provides that "the court must approve any settlement,

voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class."

Fed. R. Civ. P. 23(e).  In turn, a court may only approve "a class action settlement if it is

'fair, adequate, and reasonable, and not a product of collusion.'"  Wal-Mart Stores, Inc. v.

Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir. 2006) (quoting Joel A. v. Giuliani, 218 F.3d

132, 138 (2d Cir. 2000)).  The discretion to grant or deny such approval should be

exercised in light of the general judicial policy favoring settlement.  Weinberger v.

Kendrick, 698 F.2d 61, 73 (2d Cir. 1982).  See also Wal-Mart Stores, Inc., 396 F.3d at

1167-17 (citing In re PaineWebber Ltd. P'ships Litig., 147 F.3d 132, 138 (2d Cir. 1998).

Ultimately, the Court, as protector of the interests of absent class members, must

determine whether the proposed settlement is "fair, reasonable, and adequate."

Weinberger, 698 F.2d at 73.

      The determination of fairness, reasonableness, and adequacy "involves

consideration of two types of evidence."  Id. at 73.  The Court's primary focus is on the

"substantive terms of the settlement compared to the likely result of a trial," Malchman v.

Davis, 706 F.2d 426, 433 (2d Cir. 1983), and to that end "the trial judge must 'apprise[]

himself of all the facts necessary for an intelligent and objective opinion of the

probabilities of ultimate success should the claim[s] be litigated.'"  Weinberger, 698 F.2d

at 74 (quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry Inc. v. Anderson, 390 U.S. 414, 424, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968)).  The Court's second focus is on "the negotiating process by which the settlement was reached," Weinberger, 698 F.2d at 74, which must be examined "in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves."  Malchman, 706 F.2d at 433 (citing Weinberger, 698 F.2d at 73).  The Court has the duty to ensure that the settlement is not the product of collusion,  In re Warner Commc'ns Sec. Litig., 798 F.2d 35, 37 (2d Cir. 1986), but "[a] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."  Wal-Mart Stores, Inc., 396 F.3d at 116 (internal citation omitted).

      B.     Substantive Fairness

The analytical framework for evaluating the substantive fairness of a class action settlement was set forth by the U.S. Court of Appeals for the Second Circuit in City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974), more than three decades ago, and is now well established.  In determining whether to approve a proposed settlement, a district court should consider the following nine factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all attendant risks of litigation.

Id. at 463 (internal citations omitted).  In its consideration of these factors, "the Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case."  Id. at 462.

1. <em>The complexity, expense and likely duration of the litigation</em>

Discovery in this case is complete – including depositions of the only people with personal knowledge of the adoption of the intervening amendments to the Death Benefit Fund's governing documents.  Nonetheless, there are important issues of material fact in dispute, including the crucial question of whether the governing documents permitted the Death Benefit Fund to be terminated.  This Court has previously decided that the plan documents are ambiguous on this point and that the issue cannot be resolved as a matter of law.  See Order dated Aug. 30, 2005 denying in part and granting in part plaintiffs' motion for summary judgment and denying Heritage Fund's cross-motion for summary judgment.  A trial would drain additional resources from all the parties and, of course, any final determination after trial would be appealable, further draining resources and delaying a final resolution of this litigation.  The potential expense and delay of continuing to litigate weighs in favor of approving the Settlement Agreement.  This conclusion is bolstered by the view of the Court and the parties – discussed in greater detail below – that even were plaintiffs to prevail at trial, they would not be entitled to require an increase in benefits, and therefore will obtain relief pursuant to the proposed settlement that is potentially superior to any relief that a victory on the merits would provide, since the settlement provides an immediate benefit increase and the possibility of additional benefit increases annually over the next seven years.

2.      *The reaction of the class to the settlement*

The second factor to be considered by the Court is the reaction of the Class to the proposed settlement.  A favorable reception by the Class constitutes "strong evidence" of the fairness of a proposed settlement and supports judicial approval.  Grinnell, 495 F.2d at 462.  Similarly, a small number of objections received when compared to the number of notices sent weighs in favor of approval.  See D'Amato v. Deutsche Bank, 236 F.3d 78, 86-87 (2d Cir. 2001).  Specific objections raised by members of the Class and the Heritage Fund are addressed below, but the Court notes that out of a class estimated at the time of class certification to exceed 100,000 members, and to which around 97,000 notices were mailed, approximately one dozen Class members filed objections to the proposed settlement and the fact that the Class as a whole appears to have reacted favorably to the proposed settlement weighs in favor of its approval.  This is in no way meant to diminish the sincerity or fervor with which the objectors press their objections upon the Court.

3.      *The stage of the proceedings and the amount of discovery*
        *completed*

"If all discovery has been completed and the case is ready to go to trial, the court obviously has sufficient evidence to determine the adequacy of settlement."  See Wal-Mart Stores, Inc, 396 F.3d at 118 (citation omitted).  Here, the parties have pursued and completed extensive discovery over a period of several years.  That exercise included the review of thousands of pages of documents and depositions of the key witnesses in the case, including the trustees who approved the challenged $77.5 million transfer.  After completing discovery, plaintiffs and defendants fully briefed their respective positions on

cross-motions for summary judgment.  Furthermore, the parties engaged in extensive

negotiations under the supervision of Magistrate Judge Frank Maas for approximately six

months before reaching a settlement-in-principle and another eight additional months

before the initial proposed settlement was executed and submitted to the Court.  There

were additional months spent by the parties in an unavailing effort to forge a settlement

that would also include the Heritage Fund.  The history of this case leads the Court to

find that Class Counsel understand the merits – and pitfalls – of their positions and

adequately developed those claims before agreeing to the proposed settlement, and the

Court has adequate factual information upon which to evaluate the fairness,

reasonableness, and adequacy of the proposed settlement.  Accordingly, this third

Grinnell factor also weighs in favor of approval.

4.    *The risks of establishing liability*

Litigation inherently involves risks.  See In re Painewebber Ltd. P'ships Litig.,

171 F.R.D. 104, 126 (S.D.N.Y. 1997).  Indeed, "if settlement has any purpose at all, it is

to avoid a trial on the merits because of the uncertainty of the outcome."  In re Ira Haupt

& Co., 304 F. Supp. 917, 934 (S.D.N.Y. 1969).  Because there is substantial uncertainty

as to whether plaintiffs would prevail on the merits, this fourth Grinnell factor weighs

heavily in favor of approving the settlement.

Plaintiffs' theories of liability depend in significant part upon whether the initial

termination of the Death Benefit Fund was proper.  This determination is to be made on

the basis of the Death Benefit Fund's governing plan documents.  See Devlin v. Blue

Cross & Blue Shield, 274 F.3d 76, 83 (2d Cir. 2001) (while employers or plan sponsors

are generally free under ERISA to adopt, modify or terminate welfare plans for any

reason at any time, if a plan document "unambiguously indicates whether [retirement] benefits are vested, the unambiguous language should be enforced") (citing <u>Am. Fed'n of Grain Millers v. Int'l Multifoods Corp.</u>, 116 F.3d 976, 980 (2d Cir. 1997)).

In its August 30, 2005 decision granting in part and denying in part plaintiff's motion for summary judgment against the Heritage Fund, the Court found the governing plan documents to be ambiguous on this question.  For that reason, the Court found the question as to whether the termination of the Death Benefit Fund was proper to be a question of fact that could not be resolved on a motion for summary judgment.  The Death Benefit Fund's governing documents contain language characterizing it as an "irrevocable trust," but also contain a provision expressly providing for termination of the fund and the distribution of its surplus assets in the event of termination.  Moreover, while the documents contain an exclusive purpose provision providing that withdrawals from the Death Benefit Fund shall only be for the purpose of paying death benefits and fund administration, that provision is limited by another provision suggesting, the Court found, "that after the Death Benefit Fund's liabilities were satisfied the Union could use the surplus for purposes apart from funding benefits."  <u>See</u> Transcript dated Sept. 28, 2005 at 12.

Because the plan documents are ambiguous as to whether termination was proper, the Court could not determine on motions for summary judgment whether the transfer of funds to the Union and the Heritage Fund violated ERISA's exclusive purpose provision or fiduciary duty provisions.  As a general matter, ERISA provides that the residual assets of an employee benefit plan can be distributed to an employer when the following conditions have been met: "(A) all liabilities of the plan to participants and their

beneficiaries have been satisfied, (B) the distribution does not contravene any provision of law, and (C) the plan provides for such a distribution in these circumstances."  29 U.S.C. § 1344(d)(1).  See also Shepley v. New Coleman Holdings Inc., 174 F.3d 65, 69 (2d Cir. 1999).  While the first condition is satisfied in this case, whether the other two conditions were satisfied is disputed by the parties.  If it turns out at trial that the remaining two conditions are met, plaintiffs will not prevail.

In addition, all parties – including plaintiffs – agree that even if the plaintiff Class were to prevail at trial, the Class members would not – as a matter of law – be able to *require* a death benefit increase or any other increased monetary benefit.  (Joint Mem. at 28-29.)  This conclusion is based on the determination of the U.S. Supreme Court in Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999), where the Court found that ERISA's fiduciary duty requirement "is not implicated where . . . the Plan's settlor[] makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated."  Id. at 444 (citing Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 91, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983)).  The Second Circuit clarified that for defined benefit plans – plans, such as the Death Benefit Fund, in which employees are paid predetermined benefits from a common pool of funds, regardless of the performance of the plan's assets – participants "have no entitlement to share in a plan's surplus – even if it is partially attributable to the investment growth of their contributions."  Shepley, 174 F.3d at 68 (quoting Hughes, 525 U.S. at 444).  The Class therefore has no legal right to increase their benefits out of the surplus, and this makes clear why this action is aimed at

restoring the transferred assets to the Death Benefit Fund – not to increasing the amount of death benefits.

Based on that analysis, a realistic possibility exists that plaintiffs would not be able to establish liability against the Settling Defendants at trial.  The Settlement Agreement eliminates that risk and, furthermore, directs that a substantial portion of the remaining actuarial surplus will be used to fund benefit increases – a direct monetary benefit to the Class and a form of relief not sought – for the reasons explained above – in the underlying complaint.  Indeed, the benefit increases will not only commence upon the effective date of the settlement, but the settlement provides for the possibility of additional increases over the next seven years.  Accordingly, the risk of establishing liability at trial is not insubstantial and weighs in favor of approving the settlement, particularly where the settlement provides concrete, immediate, additional benefits to the Class.

> 5.    *The risks of establishing damages*

This is not a case in which the risk or difficulty of establishing damages weighs in favor of settlement, since it is specifically the return of the $77.5 million transfer that plaintiffs seek.

> 6.    *The risks of maintaining the class action through the trial*

Because the class certification itself does not appear to be challenged, the risk of maintaining the class action through trial is not an operative factor in considering the proposed settlement.

> 7.    *The ability of the defendants to withstand a greater judgment*

Evidence that a defendant will not be able to pay a greater judgment at trial than the amount offered in settlement tends to weigh in favor of approval of settlement, since the "prospect of a bankrupt judgment debtor down at the end of the road does not satisfy anyone involved in the use of class action procedures." In re Warner Comm'cns Sec. Litig., 618 F. Supp 735, 746 (S.D.N.Y. 1985) (quoting Grinnell Corp., 356 F. Supp. at 1389.  "However, the converse is not necessarily true; i.e., the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate."  In re Painewebber Ltd. P'ships Litig., 171 F.R.D. at 129.

The Court sees no reason to believe that the Settling Defendants as a whole would be unable to withstand a greater judgment, but that factor is not directly relevant to approval vel non of this settlement since the relief sought is the return of the $77.5 million, with any increase in death benefits funded by the available surplus in the Death Benefit Fund, rather than the independent assets of the Settling Defendants.

8, 9.    *The range of reasonableness of the settlement fund in light of the best possible recovery and in light of all attendant risks of litigation*

Fundamental to analyzing a settlement's fairness is "the need to compare the terms of the compromise with the likely rewards of litigation."  Weinberger, 698 F.2d at 73 (quoting TMT Trailer Ferry, 390 U.S. at 424-25).  Class Counsel and the Settling Defendants emphasize that the Settlement Agreement:

> is well within the range of reasonableness . . . because it achieves something which the best possible outcome – Plaintiffs' successful adjudication of the case – could never achieve: the earmarking of over $40 million . . . for the purpose of providing an initial 33 percent benefit

21

> increase to the Class to which the Class would otherwise have no legal entitlement and appropriate safeguards to assure that Fund assets will be available in the future to provide for these initial increases as well as future increases in the event the Fund exceeds its present actuarial earnings projections.

(Joint Mem. at 29.)  As described above in relation to the fourth <u>Grinnell</u> factor, the Court is mindful of the attendant risks of litigation, which include not only the possibility of failure to recover the $77.5 million transfer, but the added risk that the remaining $57 million actuarial surplus will be transferred out of the Death Benefit Fund or used for other purposes.  Indeed, these risks – combined with the Court's view that success on the merits of this action would not entitle the Class to a court order mandating increased benefits – strongly weighs in favor of approving the Settlement Agreement, which is squarely within the "range of reasonableness."  The Court does not mean to suggest that the next seven years will constitute the biblical seven years of plenty for the Class participants.  Indeed, that is far from the case, since the initial benefit increase will be approximately $825 per participant.  (<u>See</u> Settlement Agreement at ¶4(a).)  However, given the immediate increase and possibility of additional increases, balanced against the fact that the Court cannot mandate a benefit increase even if the Class ultimately prevails at trial, the proposed settlement is fair, reasonable, and adequate.

Accordingly, the Court finds that the Settlement Agreement meets the requirements of substantive fairness required of a class action settlement agreement.

C.    <u>Procedural Integrity</u>

The second fundamental indicator of fairness of the proposed settlement is whether it was properly negotiated at arm's length by the parties.  "As long as the integrity of the negotiating process is ensured by the Court, it is assumed that the forces

of self-interest and vigorous advocacy will of their own accord produce the best possible result for all sides." In re Painewebber Ltd. P'ships Litig., 171 F.R.D. at 132.  That enquiry revolves around whether the settlement process has been corrupted and whether Class Counsel has adequately represented the Class.  See Weinberger, 698 F.2d at 74.

As noted above, the Court, by its Order dated January 8, 2002, appointed Banyai and Zinn as Class Representatives and appointed Marc I. Machiz of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. and David S. Preminger of Rosen, Preminger & Bloom as Class Counsel and subsequently referred the parties to the supervision of Magistrate Judge Frank Maas for settlement discussions.  Those discussions began in August 2002 and extended over many months, eventually leading to an agreement-in-principle among Class Counsel and the Settling Defendants.  Notably, however, the parties failed to reach a global settlement that would also resolve plaintiffs' claims against Heritage Fund. After the proposed partial settlement had been reached, the Court granted a motion by Schulte Roth & Zabel – counsel for the Settling Defendants – to withdraw as attorneys for the Heritage Fund, which had previously retained separate counsel in Perlman & Perlman, LLP.  See Order dated Apr. 10, 2003.

The history of settlement talks in this action was anything but smooth. Specifically, the Class Representatives moved on October 31, 2003 for the removal of Class Counsel on the grounds that Class Counsel was not representing the best interests of the Class.[7]  The Court denied that motion, finding that Banyai and Zinn failed to

---

[7] The Class Representatives previously sought to remove Class Counsel at a July 11, 2003 Court conference. This Court denied that request without prejudice to its renewal.  Approximately five weeks later, Zinn wrote to the Court seeking permission for her to participate directly in the settlement negotiations and to retain separate "co-counsel on behalf of the Class" to negotiate in addition to Class Counsel. (Letter from Judith A. Zinn dated August 18, 2003 at 2.)  The Court denied her request to retain co-counsel because "the Class Counsel had the authority to act on behalf of the class in connection with the settlement discussions." See Memorandum Order dated August 28, 2003.

"proffer[] any concrete evidence of an actual conflict of interest or act of misconduct on Class Counsel's part."  <u>Banyai v. Mazur</u>, No. 00 Civ. 9806, 2004 U.S. Dist. LEXIS 17572, at *3 (S.D.N.Y. Sept. 1, 2004).  The Court further noted that Class Counsel on the one hand and Banyai and Zinn on the other apparently hold "divergent views as to what outcome is in the best interest of class members."  <u>Id.</u>  "Those disagreements embody reasonable differences in evaluating alternative courses of action.  They do not, however, evidence any conflict of interest or wrongdoing on [Class Counsel's] part."  <u>Id.</u>  The Court is not aware of any reason to revisit that ruling at this time.  Accordingly, the Court finds that Class Counsel has engaged in adequate and reasonable advocacy on behalf of the Class.

In sum, the Court finds that the proposed settlement was negotiated in good faith and at arms length by the parties involved.  The Court reiterates its determination – now bolstered by its review of the legal arguments of the parties and the objectors – that the Settlement Agreement "bears the indicia of being 'the product of serious, informed, non-collusive negotiations [and] has no obvious deficiencies.'"  Order dated Sept. 7, 2004 (quoting <u>In re NASDAQ Market-Makers Antitrust Litig.</u>, 176 F.R.D. 99, 102 (S.D.N.Y. 1995).  The experience of counsel, the supervisory role of an experienced magistrate judge during settlement talks, and the relative merits of the overall settlement achieved for the Class are all factors that the Court has considered in reaching its determination that the settlement process was procedurally fair and that Class Counsel has acted consistently with its obligations to promote the best interests of the class.

D.     Objections

The Court received several written objections to the proposed settlement both before and after the fairness hearing and took testimony at that hearing, as well.  Those objections that warrant discussion are as follows:

Class Representatives Zinn and Banyai object to the settlement of this litigation that was brought in their names essentially on the grounds that the settlement does not require the entirety of the $77.5 million that was transferred out of the original Death Benefit Fund to be returned.  The Court nonetheless finds that Class Counsel has made a good faith effort to pursue the interests of the Class and has made a calculated decision that the compromises contained in the proposed settlement – and, in particular, the guarantee of an immediate initial increase in the death benefit – is a reasonable trade-off that protects the overall interests of the Class.  There is no question that a settlement that provided the Class with everything that it sought in the litigation would be best for the Class, but that scenario ignores the risks of continuing this litigation which, as outlined above, are not insubstantial.

In addition, three retired Union officers object to the alleged failure of the proposed settlement to protect their ability to continue in the future to pay Union dues subsequent to their retirement dates.  The ability to pay those dues results in the retired officers reaping a significantly larger death benefit than non-officers because they are treated as "active" members, rather than retired members, at their deaths.  The three objecting retired officers are concerned that the Settlement Agreement does not prohibit the Settling Defendants from altering that arrangement in the future.  However, the position of the retired officers is not compromised vis-à-vis the other class members in

25

the Settlement Agreement, and any claims the retired officers may have due to any action taken in the future in regard to their status as "active" members is not barred by the release in the Settlement Agreement.  (See Settlement Agreement at ¶15.)

Other objections concern such matters as the specific individual named in the Settlement Agreement as the Class Trustee; the date from which the increased death benefit will be due; the lack of non-English versions of the Notice of Settlement; and the lack of a global settlement with the Heritage Fund.  The Court concludes that the ways in which those issues are addressed in the settlement agreement are fair resolutions of contested issues.

Although the Heritage Fund arguably has no standing to raise objections to the proposed settlement because it is not a party to the Settlement Agreement and would not suffer "legal prejudice" as a result of the proposed settlement's final approval, see Zupnick v. Fogel, 989 F.2d 93, 98 (2d Cir. 1993), the Heritage Fund nonetheless contends that the proposed settlement is unfair because it may ultimately be ordered to return $12.5 million to the Death Benefit Fund upon resolution of the continuing litigation between plaintiffs and the Heritage Fund; meanwhile, the Union – pursuant to the proposed settlement – will not have been obligated to return its portion of the initial $77.5 million transfer.  The Heritage Fund is correct that that is a possible outcome of the continuing litigation between it and the Class, but the Heritage Fund has decided not to participate in the Settlement Agreement.  The issue before this Court is whether the proposed settlement is fair to the plaintiff Class; it is not whether the Heritage Fund would be better off if it had participated in the proposed settlement.

III.    CONCLUSION

The proposed settlement meets the requirements of substantive fairness and procedural integrity and represents a fair and reasonable compromise in light of the risks and uncertainties inherent in continuing this litigation. The Court concludes that the Settlement Agreement is fair, reasonable, and adequate pursuant to the requirements of Fed. R. Civ. P. 23(e). Accordingly, the Settlement Agreement is approved.

Dated:    New York, New York
          March 27, 2007

Sidney H. Stein, U.S.D.J.

27