USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/18/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

EDWARD BANYAI, *ET AL.*,  :  00 Civ. 9806 (SHS)

               Plaintiffs,  :

   -against-  :  <u>OPINION AND ORDER</u>

JAY MAZUR, *ET AL.*,  :

               Defendants.  :

-----------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

      This class action litigation arises from the allegedly improper dissolution of the ILGWU Death Benefit Fund – a benefit fund of the International Ladies' Garment Workers' Union ("ILGWU" or "the Union")[1] – the simultaneous transfer of $77.5 million in actuarial surplus from the ILGWU Death Benefit Fund to an ILGWU escrow account, and, approximately one year later, the transfer of $12.5 million from that escrow account to a newly formed not-for-profit corporation, the 21st Century ILGWU Heritage Fund ("Heritage Fund").

      In mid-2007, this Court approved the settlement of this class action between the plaintiff Class and all of the defendants except the Heritage Fund (the "Initial Settlement"). Now, Class Counsel, on behalf of the plaintiff Class, and defendant Heritage Fund have jointly moved pursuant to Fed. R. Civ. P. 23(e) for final approval of the partial settlement of this class action with the sole remaining defendant – the Heritage Fund – on the terms set forth in the

---

[1] Due to a series of consolidations and mergers, in 1995 the ILGWU became UNITE!, which in turn became UNITE HERE. For purposes of this Opinion, the "Union" refers to the ILGWU, UNITE!, or UNITE HERE, as the case may be.

- 1 -

Settlement Agreement executed by the parties on January 17, 2008 (the "Heritage Fund Settlement Agreement").

By Order dated January 17, 2008, this Court granted its preliminary approval of the Heritage Fund Settlement Agreement and scheduled a hearing for May 9, 2008 on whether the terms of that Agreement were fair, reasonable, and adequate and directed Class Counsel to provide notice to the Class. Within the next six weeks, more than 90,000 members of the Class were sent notice by first class mail of the terms of the proposed Heritage Fund Settlement Agreement and the date and purpose of the fairness hearing and the procedures for filing objections. (Decl. of Laurence D. McBride Regarding Distribution of Notice and the Publication of Summary Notice dated Apr. 29, 2008 ("McBride Decl.") ¶ 7(a).) Notice was also provided by newspaper publication. (Id. ¶ 8; Verification of Publication, USA Today, Ex. C to McBride Decl.) Subsequently, four objections were filed by members of the Class. At the fairness hearing on May 9, 2008, the Court heard legal argument from the parties; no one spoke in opposition to the proposed settlement. (See Tr. dated May 9, 2008 ("May 9 Tr.") at 22.)

As explained below, the Court has examined the substantive fairness of the proposed settlement and the procedural integrity of its negotiations. Based on an analysis of all of the factors set forth by the U.S. Court of Appeals for the Second Circuit in City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974), the Court concludes that the compromise embodied by the proposed settlement is fair, reasonable, and adequate. Accordingly, the settlement of this class action between the plaintiff Class and the Heritage Fund is approved pursuant to Fed. R. Civ. P. 23(e).

I.  **BACKGROUND**

    A.    History of This Action

The facts underlying this litigation, its extensive procedural history, and the history of the approval of the partial settlement of this action between the plaintiff Class and all the defendants except the Heritage Fund, are set forth at substantial length and detail in this Court's Opinion dated March 27, 2007. See Banyai v. Mazur, No. 00 Civ. 9806, 2007 U.S. Dist LEXIS 22342, at *5-21 (S.D.N.Y. Mar. 27, 2007). Familiarity with that Opinion is presumed, and Section I of that Opinion, entitled "Facts," is incorporated as part of this Opinion.

    B.    Additional Facts Concerning the Heritage Fund Settlement

Prior to the approval of the settlement between the Class and all the defendants except the Heritage Fund, the plaintiffs and the Heritage Fund filed cross motions for summary judgment. In a decision partially granting and partially denying plaintiffs' motion and denying the Heritage Fund's motion, this Court determined that the relevant plan documents were ambiguous on the crucial issue of whether the termination of the Death Benefit Fund and its subsequent transfer were permissible. (See Tr. dated Sept. 28, 2005 at 10-14; Order dated Aug. 30, 2005.)

After the Initial Settlement was approved by this Court on March 27, 2007, the litigation continued between the Class and the Heritage Fund. In addition, settlement negotiations were held both directly between the parties as well as under the aegis first of United States Magistrate Judge Frank Maas, and later, with United States District Judge Harold Baer, Jr. acting as a mediator. Ultimately, as noted above, the Class and the Heritage Fund entered into the Heritage Fund Settlement Agreement on January 17 of this year.

       1.  *The Terms of the Heritage Fund Settlement Agreement*

    The Heritage Fund Settlement Agreement requires that, upon the effective date of the settlement, $6.1 million of the $12.5 million that the Heritage Fund received from the termination of the Death Benefit Fund, net of fees and expenses awarded to Class Counsel by the Court and the cost of notice to the Class plus earnings and less losses, is to be repaid to the Death Benefit Fund. (Heritage Fund Settlement Agreement at 4, 10-11; May 9 Tr. at 9.) That sum is to be used exclusively to increase benefits for the members of the Class. (Initial Settlement Agreement dated Sept. 26, 2003, amended Jan. 12, 2004, ¶¶ 13-14; Parties' Joint Memorandum of Law in Support of Final Approval of Settlement ("Joint Mem.") at 6.) The $6.1 million settlement payment has already been paid by the Heritage Fund and is being held in an escrow account with Class Counsel as the escrow agent. The escrow account is invested exclusively in United States Treasury securities. (Heritage Fund Settlement Agreement at 6.) The settlement is contingent on Court approval.[3]

    Assuming that the Trustees of the Death Benefit Fund raise benefits for participants as required by the terms of the Initial Settlement, the parties estimate that the benefit increase attributable to this new settlement with the Heritage Fund (after the payment of requested fees and expenses from the Settlement Fund) will exceed $100.00 per participant, with the potential for additional future increases. (See Joint Mem. at 7; May 9 Tr. at 6-8.) That is on top of the estimated $825.00 increase in benefits per person attributable to the Initial Settlement Agreement. (May 9 Tr. at 6-8.)

---

[3] The settlement was also contingent upon the Internal Revenue Service issuing a private letter ruling establishing that the payment of the $6.1 million settlement amount did not adversely affect the tax status of the not-for-profit Heritage Fund. (Heritage Fund Settlement Agreement at 4-6.) The parties have advised the Court that that private letter ruling has in fact been issued. (Letter from David Preminger, Esq. dated May 16, 2008.)

In exchange for those benefits, the members of the Class give up their right to seek a recovery from the Heritage Fund on behalf of the Death Benefit Fund of the full $12.5 million that was transferred to the Heritage Fund, together with any earnings on that amount. At the time of the Heritage Fund Settlement Agreement, the Heritage Fund held approximately $13 million, of which approximately $500,000 had been committed to various charities. (May 9 Tr. at 17.)

The Heritage Fund Settlement also provides that all claims which have been asserted in the action by the Heritage Fund shall be dismissed with prejudice and without costs, and that Class members shall release their claims. (Heritage Fund Settlement Agreement at 12.) Finally, the Heritage Fund shall release any claims it may have that would reduce the Initial Settlement with respect to the other defendants to the action. (Id.)

2. *Preliminary Approval, Notice to the Class and the Rule 23(e) Hearing*

On January 17, 2008, this Court entered an "Order of Preliminary Approval of Partial Settlement of Class Action," preliminarily approving the settlement with the Heritage Fund; directing that notice be given to class members; appointing Wells Fargo Bank, N.A. as Settlement Administrator with respect to the Notice of Proposed Class Action Settlement and Settlement Hearing; directing that a hearing be held on May 9, 2008, to determine whether the settlement should be finally approved; and setting forth a procedure whereby any member of the class could file objections and appear at the May 9 hearing. In late February and early March 2008, notice of the proposed settlement was mailed to 91,986 members of the Class by first class mail. (McBride Decl. ¶ 7(a).) A variety of follow up services were performed, including remailing notices where forwarding addresses were provided by the U.S. Postal Service and publication of the Summary Notice in USA Today. (Id. ¶¶ 7-8; Ex. C to McBride Decl.)

Subsequently, four class members filed written objections.[4] The settlement hearing took place on May 9, 2008; no one spoke in opposition to approval of the settlement at that time.

## II.    DISCUSSION

### A.    The Standard for Approving a Proposed Class Action Settlement

Fed. R. Civ. P. 23(e) provides that a class action may be settled only with the Court's approval. The Court's decision should be exercised in light of the general judicial policy favoring settlement. Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982); see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116-17 (2d Cir. 2005) (citing In re PaineWebber Ltd. P'ships Litig., 147 F.3d 132, 138 (2d Cir. 1998)). Ultimately, the Court, as protector of the interests of absent class members, must determine whether the proposed settlement is "fair, reasonable and adequate." Weinberger, 698 F.2d at 73.

The determination of fairness, reasonableness, and adequacy "involves consideration of two types of evidence." Id. The Court's primary focus is on the "substantive terms of the settlement compared to the likely result of a trial," Malchman v. Davis, 706 F.2d 426, 433 (2d Cir. 1983), and to that end "the trial judge must 'apprise[] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim[s] be litigated,'" Weinberger, 698 F.2d at 74 (quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968)). The Court's second focus is on "the negotiating process by which the

---

[4] It should be noted that Edward Banyai and Judith A. Zinn, the class representatives, have consistently taken the position that anything other than the return of 100% of the money transferred out of the Death Benefit Fund to any defendant was unacceptable as a settlement. See Banyai, 2007 U.S. Dist. LEXIS 22342, at *38-40. Although neither Zinn nor Banyai filed objections to the Heritage Fund Settlement Agreement, the Court has no reason to believe they have changed their position. See id.; May 9 Tr. at 14; Joint Mem. at 18.

settlement was reached," id., which must be examined "in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves," Malchman, 706 F.2d at 433 (citing Weinberger, 698 F.2d at 73). The Court has the duty to ensure that the settlement is not the product of collusion, In re Warner Commc'ns Sec. Litig., 798 F.2d 35, 37 (2d Cir. 1986), but "[a] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." Wal-Mart Stores, Inc., 396 F.3d at 116 (internal quotation marks and citation omitted).

    B.    Substantive Fairness

The substantive fairness of a class action settlement is analyzed by applying the following nine factors as delineated by the Second Circuit in City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974) as follows:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

Id. at 463 (internal citations omitted).

The Court will now analyze each of the Grinnell factors in turn as they relate to this settlement.

    1.    *The complexity, expense and likely duration of the litigation.*

Although discovery was completed before the Initial Settlement was approved, there are still critical issues of material fact in dispute in this litigation, including whether the governing documents permitted the Death Benefit Fund to be terminated as well as the intent of

the settlors of the Death Benefit Fund. This Court has previously decided that the plan documents are ambiguous on this point and that the issue cannot be resolved as a matter of law. (See Tr. dated Sept. 28, 2005 at 25; Order dated Aug. 30, 2005 (denying in part and granting in part plaintiffs' motion for summary judgment and denying the Heritage Fund's cross-motion for summary judgment).)

A trial would drain additional resources from the class and the Heritage Fund. In addition, any final determination after trial would be appealable, further draining resources and delaying a final resolution of the dispute with the Heritage Fund. The potential expense and delay of continuing to litigate weighs in favor of approving the Heritage Fund Settlement Agreement. This conclusion is bolstered by the view of the Court and the parties – discussed in greater detail below – that even were plaintiffs to prevail at trial, they would not be entitled to require the trustees of the Death Benefit Fund to increase death benefits. Therefore, the relief that plaintiffs will receive pursuant to the proposed settlement is potentially superior to any relief after a victory on the merits.

2. *The reaction of the class to the settlement.*

The second factor to be considered by the Court is the reaction of the Class to the proposed settlement. A favorable reception by the Class constitutes "strong evidence" of the fairness of a proposed settlement and supports judicial approval. Grinnell, 495 F.2d at 462. Similarly, a small number of objections received when compared to the number of notices sent weighs in favor of approval. See D'Amato v. Deutsche Bank, 236 F.3d 78, 86-87 (2d Cir. 2001). Out of approximately 90,00 notices mailed to Class members, only four Class members filed objections. The fact that the Class as a whole appears to have reacted favorably to the proposed settlement weighs in favor of its approval.

Of the objections, two of the objectors oppose the settlement on the ground that they were counting on the death benefit to pay the costs of their funerals. (Objection of Benjamin W. Dansavage dated Mar. 13, 2008, Ex. 1 to Index to Class Members' Objections dated Apr. 30, 2008 ("Index"); Objection of Mavous Speegle dated Mar. 14, 2008, Ex. 2 to Index.) Regardless of the particular cost of a funeral, the settlement will result in increased benefits for those class members who die after December 1, 2002. (Joint Mem. at 14.) Taken together with the Initial Settlement, the settlements will increase the death benefit by "at least $925," of which $100 is attributable to the Heritage Fund Settlement. (Id.)

The other two objectors object to the settlement in part on the ground that Class Counsel did not receive input from the Class when negotiating the Heritage Fund Settlement. (Objection of Douglas Levin dated Apr. 21, 2008, Ex. 3 to Index; Objection of Emanuel Leventhal dated Apr. 21, 2008, Ex. 4 to Index.) However, one mechanism for obtaining the views of the Class is through the Rule 23 notice to the Class: as previously noted, only four out of the more than 90,000 Class members have filed objections, which suggests substantial comfort by the Class with the terms of the Heritage Fund Settlement.

All four objectors are retired Union officers who appear to be objecting to this settlement on the same grounds as they objected to the Initial Settlement; i.e., they are concerned that the Union may in the future prohibit them from paying Union dues, which would negatively impact their ability to reap the higher death benefits due officers. (Joint Mem. at 15-16.) The Court's response to that objection is the same as it was for the Initial Settlement, namely, that any claim that arises due to future actions by the Union is not barred by either the Initial Settlement or the Heritage Fund Settlement. See Banyai, 2007 U.S. Dist. LEXIS 22342, at *41-42.

3. *The stage of the proceedings and the amount of discovery completed.*

This third Grinnell factor also weighs in favor of settlement for the reasons set forth in the Opinion approving the Initial Settlement. See id. at *27-29. In summary, the parties pursued and completed extensive discovery over several years of litigation, engaged in extensive motion practice, and took part in active – sometimes heated – settlement negotiations. (See May 9 Tr. at 10.) After the Initial Settlement was approved, the parties undertook renewed negotiations supervised first by Magistrate Judge Frank Maas and then by U.S. District Judge Harold Baer, Jr. (Id.) The Court finds, just as it did in approving the Initial Settlement, that Class Counsel understand the merits – and pitfalls – of their positions and adequately developed those claims before agreeing to the proposed settlement, and the Court has adequate factual information upon which to evaluate the fairness, reasonableness, and adequacy of the proposed settlement. See Banyai, 2007 U.S. Dist. LEXIS 22342, at *28-29. Accordingly, this third Grinnell factor also weighs in favor of approval.

4. *The risks of establishing liability.*

This factor also favors approval of the settlement for the same reasons set forth in the Initial Settlement and the reader is referred to that opinion. See Banyai, 2007 U.S. Dist. LEXIS 22342, at *29-35. In summary form, there is substantial uncertainty as to whether the Class would prevail, resulting from the ambiguity in the documents that established the Death Benefit Fund as to whether the initial termination of the Death Benefit Fund was proper. Id. at *31-32. Therefore, the Court could not determine in motions for summary judgment whether the subsequent transfer of funds to the Union and the Heritage Fund were proper. Id. In addition, all parties to this litigation – the Class and all defendants – agree that even if the Class were to

prevail at trial, the Class members could not require a death benefit increase or any other monetary benefit. Id. at *32.

        5.    *The risks of establishing damages.*

As the Court wrote in approving the Initial Settlement, "[t]his is not a case in which the risk or difficulty of establishing damages weighs in favor of settlement," since it is specifically the return of the $12.5 million transfer plaintiffs seek from the Heritage Fund. Id. at *34.

        6.    *The risk of maintaining the class action through trial.*

Because the class certification itself is not being challenged, the risk of maintaining the class action through trial is not a factor in considering the proposed settlement.

        7.    *The ability of the Heritage Fund to withstand a greater judgment.*

The Heritage Fund is able to withstand a greater judgment, because plaintiffs in this settlement have recovered approximately 49% of the assets of the Heritage Fund. However, there is no guarantee that the Heritage Funds' remaining assets would be available to pay a judgment at the end of a trial and appeal, since its investments could lose value or it could make charitable transfers consistent with its non-profit status, thereby reducing – or extinguishing – its asset base. Because the settlement amount of $6.1 million has already been placed in escrow, the Settlement guarantees payment of the full amount to the Class, rather than facing an uncertain recovery in the future.

        8, 9.    *The range of reasonableness of the settlement fund in light of the best possible recovery and in light of all attendant risks of litigation.*

If the Court were to ultimately conclude that the Death Benefit Fund was properly terminated and its assets properly transferred to the Heritage Fund, the Class would recover nothing and there would be no additional money designated for the purpose of increasing death

benefits. As noted above, the Settlement requires the return of approximately 49% of the distribution plaintiffs have sought. Given the risks of this litigation, as outlined above and in the Initial Settlement, see id. at *35-37, this settlement is fair, reasonable and adequate. See In re PaineWebber, 171 F.R.D. at 126 (citing In re Ira Haupt & Co., 304 F. Supp. 917, 934 (S.D.N.Y. 1969)).

        C.     Procedural History

The second fundamental indicator of fairness of the proposed settlement is whether it was properly negotiated at arm's length by the parties. "As long as the integrity of the negotiating process is ensured by the Court, it is assumed that the forces of self-interest and vigorous advocacy will of their own accord produce the best possible result for all sides." In re PaineWebber, 171 F.R.D. at 132.

The settlement negotiations here were hard fought and at arm's length. The history of the lengthy original discussions, which also involved the Heritage Fund for a considerable period of time, is described in the Opinion approving the Initial Settlement. See Banyai, 2007 U.S. Dist. LEXIS 22342, at *38-40. Subsequent to the approval of the Initial Settlement, settlement discussions were recommenced with the Heritage Fund. Eventually, an experienced U.S. District Judge acted as a mediator in supervising those discussions. (See May 9 Tr. at 10.)

In sum, the Court finds that the proposed settlement was negotiated in good faith and at arm's length by the parties involved. The Court reiterates its determination – bolstered anew by its review of the legal arguments of the attorneys and the objectors – that the Settlement Agreement "bears the indicia of being 'the product of serious, informed, non-collusive negotiations and has no obvious deficiencies.'" (Order dated Sept. 7, 2004 (quoting In re

NASDAQ Market-Makers Antitrust Litig., 176 F.R.D. 99, 102 (S.D.N.Y. 1995).) The experience of counsel, the supervisory role of other federal judges during settlement talks, and the relative merits of the overall settlement achieved for the Class are all factors that the Court has considered in reaching its determination that the settlement process was procedurally fair and that Class Counsel has acted consistently with its obligations to promote the best interests of the class. See Wal-Mart Stores, Inc., 396 F.3d at 116-17.

## III.  CONCLUSION

The proposed settlement meets the requirements of substantive fairness and procedural integrity and represents a fair and reasonable compromise in light of the risks and uncertainties inherent in continuing this litigation. The Court concludes that the Heritage Fund Settlement Agreement is fair, reasonable, and adequate pursuant to the requirements of Fed. R. Civ. P. 23(e), and the Heritage Fund Settlement Agreement is hereby approved.

Dated: New York, New York
       November 18, 2008

SO ORDERED:

Sidney H. Stein, U.S.D.J.